## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

UNITED STATES OF AMERICA

v.

JOSE SORTO-GOMEZ,

       Defendant.

Crim. Action No. TDC-24-0071

## MEMORANDUM OPINION

Defendant Jose Sorto-Gomez has been charged with one count of Reentry of an Alien Removed After a Felony Conviction, in violation of 8 U.S.C. §§ 1326(a) and (b)(1). Sorto-Gomez has filed a Motion to Dismiss the Indictment on the grounds that the entry of his 2012 removal order deprived him of the opportunity for judicial review and was fundamentally unfair. After briefing, the Court held a hearing on the Motion on November 19, 2024. ECF No. 40. The Court then directed the parties to submit supplemental briefing on specific legal issues relevant to the resolution of the Motion. For the reasons set forth below, the Motion to Dismiss the Indictment will be GRANTED.

## BACKGROUND

### I.    Personal History

Sorto-Gomez, who was born in 1987, is a native and citizen of El Salvador. In 1988, his mother immigrated to the United States, leaving Sorto-Gomez to be raised by his grandmother. When Sorto-Gomez was approximately 11 years old, he was sent to join his mother in the United States. On February 5, 1998, Sorto-Gomez entered the United States without authorization.

On June 7, 2002, Sorto-Gomez's mother became a lawful permanent resident pursuant to section 203 of the Nicaraguan Adjustment and Central American Relief Act ("NACARA"), Pub. L. No. 105-100, 111 Stat. 2160, 2193–2200 (1997), which allows certain Salvadoran nationals who first entered the United States before September 19, 1990 to obtain immigration relief and legal status for themselves and their dependents. Sorto-Gomez's mother, however, did not arrange for Sorto-Gomez to receive immigration relief under NACARA as her dependent. Although Sorto-Gomez may have sought or obtained Temporary Protected Status ("TPS") at some point following his arrival to the United States, that legal status was either denied or expired.

During his time in the United States, Sorto-Gomez attended school, engaged in work, and had two children, both of whom are United States citizens. Between 2005 and 2009, Sorto-Gomez was arrested for, but not convicted of, multiple state criminal offenses, including destruction of property, malicious destruction of property, attempted murder, first- and second-degree assault, illegal possession of a handgun, distribution and possession with intent to distribute cocaine, fourth-degree burglary, attempted theft, attempted motor vehicle theft, and fugitive from justice.

On November 21, 2010, Sorto-Gomez was arrested and charged with second-degree burglary, theft, two counts of fourth-degree burglary, and two counts of malicious destruction of property. As a result of these charges, on October 12, 2011, Sorto-Gomez pleaded guilty in the Circuit Court for Prince George's County, Maryland to one count of malicious destruction property over $500 ("Count 4"); one count of malicious destruction of property, ("Count 5"); and one count of malicious destruction of property under $500 ("Count 6"), all in violation of the Maryland malicious destruction of property statute, Md. Code Ann., Crim. Law § 6–301 (LexisNexis 2021). The remaining charges were resolved by *nolle prosequi*. On February 21, 2012, Sorto-Gomez was

2

sentenced to 60 days of imprisonment, with all but 30 days suspended, on each of Counts 4 and 5, and to 60 days of imprisonment on Count 6, all to run consecutively.

## II.     2012 Removal Proceedings

On October 18, 2012, Sorto-Gomez was issued a United States Department of Homeland Security ("DHS") Notice to Appear ("NTA") informing him that he was subject to deportation based on the facts that he was not a citizen of the United States, that he was not lawfully admitted to or paroled into the United States, and that he had the three prior convictions for malicious destruction of property. Specifically, it asserted that he was subject to deportation under section 212(a)(6)(A)(i) of the Immigration and Nationality Act ("INA"), because he was an "alien present in the United States without being admitted or paroled," 8 U.S.C. § 1182(a)(6)(A)(i), and under section 212(a)(2)(A)(i)(I) of the INA, because he was an alien who has been convicted of "a crime involving moral turpitude," 8 U.S.C. § 1182(a)(2)(A)(i)(I); NTA at 3, Mot. Dismiss Ex. B, ECF No. 29-2.

On November 7, 2012, Sorto-Gomez attended removal proceedings before Immigration Judge Elizabeth Kessler (the "IJ"), at which a DHS attorney represented the Government. Sorto-Gomez was provided an interpreter to translate the proceedings into Spanish.

The removal proceedings consisted of two phases. First, the IJ conducted a "Removal Hearing." Removal Hrg. Tr. at 1, Reply Ex. I, ECF No. 39-1. During that proceeding, the IJ informed Sorto-Gomez of several of his rights, specifically "the right to present evidence, to examine evidence presented by the Government and to cross examine any witnesses should any witnesses be called." *Id.* at 4. The IJ also advised Sorto-Gomez that he had the "right to have an attorney represent [him] in these proceedings at no expense to the U.S. Government" and also informed him that there was "a list of free and low cost legal service providers in the area that we

3

can give to you." *Id.* When the IJ asked Sorto-Gomez, "Would you like time to get an attorney or would you like to go ahead to day and represent yourself without an attorney," Sorto-Gomez elected to represent himself. *Id.*

The IJ then proceeded to ask Sorto-Gomez to confirm the allegations in the NTA. In response to those questions, Sorto-Gomez admitted that he was not a citizen of the United States, that he entered the United States without authorization, and that he was convicted of three counts of malicious destruction of property in 2012. The IJ also reviewed the removal charges in the following exchange:

> THE COURT: Okay. There are -- you are being charged with two different reasons that you are now removable from the United States, one is that you are subject to being removed from the United States because you entered unlawfully. Is that true?
>
> MR. SORTO-GOMEZ: Yes.
>
> THE COURT: And the other one is that you're subject to being removed from the United States because you were convicted of a crime involving moral turpitude. In your case, the malicious destruction of property in particular over $500. Would you agree that is true?
>
> MR. SORTO-Gomez: Yes.

*Id.* at 5–6.

The IJ then noted that she would review Sorto-Gomez's conviction records provided by the DHS attorney even though Sorto-Gomez had acknowledged that he was removable, "just to make sure that the records do support your own plea." *Id.* at 7. Following this review, the IJ found that "based on the evidence of DHS and also the Respondent's pleading, I do find that the Respondent is removable as charged." *Id.* at 8. The IJ designated El Salvador as the country of removal and confirmed that Sorto-Gomez did not have a fear of persecution or torture if he were to be returned to El Salvador.

After confirming with Sorto-Gomez that he had been present in the United States for 15 years, the IJ then asked the Government whether Sorto-Gomez would be eligible for cancellation of removal "with the CIMT," a reference to a crime involving moral turpitude. *Id.* at 8–9. The Government responded that its position was that Sorto-Gomez was ineligible. The IJ then asked Sorto-Gomez if anyone, such as a family member or employer, had ever filed an immigration petition on his behalf, to which Sorto-Gomez replied in the negative. Although Sorto-Gomez stated that he had TPS before and that it had expired, the IJ, upon reviewing records provided by the Government, stated that "it looked like TPS had been denied." *Id.* at 9. The IJ then asked the DHS attorney if he could "see any possibilities of relief," to which he responded that he did not. *Id.* The IJ then told Sorto-Gomez that "it doesn't look to me like you are eligible for relief at this point" but still advised Sorto-Gomez that he could apply for Deferred Action for Childhood Arrivals and that he could reschedule the case so that he could talk to an attorney. *Id.* at 9–10.

Finally, the IJ asked the Government whether Sorto-Gomez was eligible for voluntary departure. The Government responded that Sorto-Gomez was eligible but that the Government would "oppose as a matter of trust." *Id.* at 10. The IJ then informed Sorto-Gomez that she could "either close out the case with a removal order or see if you are eligible for voluntary departure," noting that "DHS might oppose that because of the conviction." *Id.* When asked how he would like to proceed, Sorto-Gomez responded that "[t]he truth is that I couldn't understand very well of that." *Id.* The IJ then had the following exchange with Sorto-Gomez:

> THE COURT: Okay. Sure. If you would like to try to talk to an attorney about your case, I can reschedule your case for another date so that you can at least to try to talk to an attorney. If you don't want to do that, I can see if you are eligible for voluntary departure today and if are not interested in that, or if you are not eligible for that, I could just issue a removal order in your case.
>
> MR. SORTO-GOMEZ: I really don't know what to tell you because my family is not -- he is not in the country at the moment because they have to leave the country

and they have to go back to my country because they had an emergency. A family member passed away. So they are not here. So I would have to wait to be able to talk to them. The only people that I have here in the country are my wife and my children. And my wife works and from work she goes home to take care of the children. So it would be very difficult for her to help me or assist me in this case. But I would have to talk to my family members. Now on the other hand, I don't know if I could qualify for like a bond or something?

THE COURT: I did see that you requested a bond hearing. If you would like to represent yourself today and have the bond hearing today, we could do that. Alternatively, if you wanted to try to talk to an attorney, I can reschedule your bond hearing for another day so you could try to talk to an attorney about the case. How did you want to proceed with respect to the bond hearing?

MR. SORTO-GOMEZ: I would like to do it today.

THE COURT: Okay. Then we are off the record --

*Id*. At no point during the Removal Hearing did the IJ advise Sorto-Gomez that he had the right to appeal an adverse removal decision.

The IJ then initiated a separate "Bond Hearing." Bond Hearing Tr. at 1, Reply Ex. J, ECF No. 39-2. During that proceeding, the IJ first asked Sorto-Gomez several questions about his background. Sorto-Gomez responded that (1) although he was unmarried at the time, he planned on marrying his girlfriend that same month; (2) he had two children, both of whom were United States citizens; and (3) he had been in the United States for 15 years. When asked how many times he had been arrested, Sorto-Gomez acknowledged that there had been "many times." *Id.* at 5. When asked about the arrest for attempted murder, Sorto-Gomez stated that "there were some people at the house where my mother was renting a place to them" but that he had left "to do the laundry" and "was not there." *Id.* at 5. When asked about his arrest for burglary, Sorto-Gomez stated that he was "extremely drunk" and that he "cannot remember anything" about that incident. *Id.*

6

In support of his request for bond, Sorto-Gomez stated that he needed bond to continue supporting his mother, his girlfriend, and his children. He noted that he sometimes worked with his mother putting up fences, that he helped pay his mother's rent and that she was in danger of "los[ing] her house," and that he needed to help with the children while his girlfriend was working and trying to save money to go to college. *Id.* at 6. In response, the Government stated that it opposed bond and argued that Sorto-Gomez was subject to mandatory detention based on his prior convictions. The Bond Hearing concluded as follows:

> THE COURT: All right. Sir, based on the convictions that you have, I agree with -- on DHS's position in court today that you fall under our mandatory detention provisions and that I do not have authority to set a bond in your case. So for that reason, I am going to have to deny the request for bond. Again I conclude that I don't have jurisdiction and that you are subject to mandatory detention.
>
> You do have a right to appeal this decision. If you want to appeal my decision today, you would have to file an appeal with the Board of Immigration Appeals within 30 days. Would you like to file an appeal or would you like to waive your right to appeal?
>
> MR. SORTO-GOMEZ: I would like to waive it. I would like to know if you could give me voluntary departure.
>
> THE COURT: Okay. Then let me -- the bond proceeding is closed.

*Id.* at 7.

There is no record that any further proceedings took place, whether relating to voluntary departure or otherwise. On the day of the hearings, however, the IJ signed an "Order of the Immigration Judge" relating to "Removal Proceedings" (the "Removal Order"), Mot. Dismiss Ex. F, ECF No. 29-6, and a separate "Order of the Immigration Judge with Respect to Custody" (the "Bond Order"), Mot. Dismiss Ex. E at 1, ECF No. 29-5. In the Removal Order, consisting of a form with items to be checked or circled, the IJ stated that Sorto-Gomez's "application for voluntary departure was denied" and that Sorto-Gomez "was ordered removed to El Salvador."

Removal Order at 1. The IJ further noted that an appeal was "reserved" and would be due by December 7, 2012, which was 30 days after the Removal Hearing. *Id.* On the Bond Order, the IJ marked that the request for bond was denied and that Sorto-Gomez had waived his right to appeal, as he had stated during the Bond Hearing.

On November 29, 2012, after his removal proceedings but prior to his deportation, Sorto-Gomez was arrested for theft of a sum greater than $1,000 and less than $10,000. He was convicted of that charge on February 1, 2013. On February 27, 2013, Sorto-Gomez was deported to El Salvador.

### III.   Subsequent Immigration History

In April 2013, Sorto-Gomez was arrested in Washington, D.C. on a motor vehicle charge. On June 25, 2013, an Immigration Officer executed a "Notice of Intent/Decision to Reinstate Prior Order" that reinstated the November 7, 2012 Removal Order (the "2012 Removal Order") and thereby authorized Sorto-Gomez's removal based on that prior order. Opp'n Ex. 4, ECF No. 35-4. On January 17, 2014, Sorto-Gomez was deported back to El Salvador on this basis.

By January 2015, Sorto-Gomez was back in the United States and again encountered law enforcement, this time in North Carolina. He was charged with and pleaded guilty in the United States District Court for the Western District of North Carolina to Reentry of a Removed Alien After a Felony Conviction, in violation of 8 U.S.C. §§ 1326(a) and (b)(1). He was sentenced to 14 months of imprisonment to be followed by three years of supervised release.

In June 2018, Sorto-Gomez was convicted in the Circuit Court for Prince George's County of first-degree burglary and was sentenced to five years of imprisonment, with all but one year suspended. In December 2019, Sorto-Gomez was convicted in the same court of fourth-degree burglary and sentenced to three years of imprisonment, with all but one year suspended. On

November 19, 2020, an Immigration Officer executed another Decision to Reinstate Prior Order, and on December 18, 2020, Sorto-Gomez was deported to El Salvador for a third time based on the 2012 Removal Order.

## IV.    Procedural History

On January 23, 2024, Sorto-Gomez was once again apprehended in the United States. On February 29, 2024, a federal grand jury in the United States District Court for the District of Maryland charged Sorto-Gomez with one count of Reentry of a Removed Alien After a Felony Conviction, in violation of 8 U.S.C. §§ 1326(a) and (b)(1). Sorto-Gomez had an initial appearance in the District of Maryland on March 7, 2024. On August 6, 2024, Sorto-Gomez filed the present Motion to Dismiss the Indictment. After briefing, the Court held a hearing on the Motion on November 19, 2024, at which Sorto-Gomez presented the testimony of Himedes V. Chicas, Esq., who was offered as an expert witness on removal defense, the consequences of criminal convictions on immigration, and the forms of relief available before immigration courts. Following the hearing, the Court directed the parties to file supplemental briefs by December 19, 2024 on issues relating to (1) the standard applied in assessing whether an individual should be found to be of "good moral character" as required for the granting of various forms of immigration relief addressed in the Motion, how an individual's criminal history of convictions and arrests affects that determination, and whether on remand from an appeal in the present case, Sorto-Gomez would have been found to be of good moral character; and (2) the standards applied in assessing whether an IJ has properly exercised discretion in granting or denying pre-conclusion voluntary departure, how an individual's criminal history of convictions and arrests would affect that determination, and whether on remand from an appeal in the present case, Sorto-Gomez would have received pre-conclusion voluntary departure. ECF No. 42. The Government filed its brief

9

on December 19, 2024 and Sorto-Gomez, upon the grant of an extension of the deadline, filed his brief on January 3, 2025.

## DISCUSSION

In the Motion, Sorto-Gomez argues that the Indictment should be dismissed "because it is based on an invalid removal order issued in 2012." Mot. Dismiss at 8, ECF No. 29. Specifically, Sorto-Gomez asserts that the "removal order is invalid because [he] was prejudicially denied due process in the underlying 2012 removal proceeding," *id.*, as a result of the following deficiencies: (1) he was not informed that he could seek certain forms of discretionary relief from deportation, including adjustment of status under NACARA, cancellation of removal under 8 U.S.C. § 1229b, and voluntary departure under 8 U.S.C. § 1229c; (2) the IJ committed legal error by classifying Sorto-Gomez's prior convictions as for crimes involving moral turpitude, which impacted her conclusion that certain forms of discretionary relief were unavailable; (3) the IJ failed to develop the record adequately during the Removal Hearing; and (4) Sorto-Gomez was not informed of his right to appeal the Removal Order.

## I.   Legal Standards

Sorto-Gomez has been charged with one count of Reentry of a Removed Alien After a Felony Conviction, under which it is a criminal offense when an alien who "has been . . . deported, or removed" thereafter "enters, attempts to enter," or "is at any time found in, the United States" without the express consent of the Attorney General to the alien's reapplication for admission, and for which there is an enhanced penalty if the alien's prior "removal was subsequent to a conviction for . . . a felony." 8 U.S.C. §§ 1326(a), (b)(1).

To establish a violation of this offense, the Government must prove the following two elements: (1) that the defendant was deported or removed from the United States while an order

of deportation or removal was outstanding; and (2) that the defendant subsequently entered, attempted to enter, or was "at any time found in" the United States "without authorization." *United States v. Guzman-Velasquez*, 919 F.3d 841, 844 (4th Cir. 2019) (footnote omitted) (quoting 8 U.S.C. § 1326(a)). As relevant here, the "removal element requires proof of both a prior removal and the existence of an outstanding removal order." *Id.* "Typically, the government may rely on the removal order itself . . . to meet this burden." *United States v. Moreno-Tapia*, 848 F.3d 162, 165 (4th Cir. 2017). In *United States v. Mendoza-Lopez*, 481 U.S. 828 (1987), however, upon finding that the deportation proceedings underlying a charge of illegal reentry after removal were not conducted in conformity with due process, the United States Supreme Court held that those proceedings could not "be used to support a criminal conviction, and the dismissal of the indictments against [the defendants] was therefore proper." *Id.* at 842. Thus, "the fact of a removal order may not be treated as conclusive proof of an element of a criminal offense where the immigration proceeding 'was not conducted in conformity with due process.'" *Moreno-Tapia*, 848 F.3d at 165 (quoting *Mendoza-Lopez*, 481 U.S. at 838–39).

In *Mendoza-Lopez*, the Supreme Court also held that "a collateral challenge to the use of a deportation proceeding as an element of a criminal offense must be permitted where the deportation proceeding effectively eliminates the right of the alien to obtain judicial review." *Id.* at 839; *see also United States v. El Shami*, 434 F.3d 659, 663 (4th Cir. 2005) (stating that, pursuant to *Mendoza-Lopez*, a noncitizen "can collaterally attack the propriety of the original deportation order in the later criminal proceeding"). Congress responded by adding a provision to 8 U.S.C. § 1326 to establish ground rules for such collateral challenges in illegal reentry after removal cases. *See Guzman-Velasquez*, 919 F.3d at 845. That provision states that:

> In a criminal proceeding under this section, an alien may not challenge the validity of the deportation order described in subsection (a)(1) or subsection (b) unless the alien demonstrates that--
>
> (1) the alien exhausted any administrative remedies that may have been available to seek relief against the order;
>
> (2) the deportation proceedings at which the order was issued improperly deprived the alien of the opportunity for judicial review; and
>
> (3) the entry of the order was fundamentally unfair.

8 U.S.C. § 1326(d). "These requirements are listed in the conjunctive, so a defendant must satisfy all three in order to prevail." *El Shami*, 434 F.3d at 663 (quoting *United States v. Wilson*, 316 F.3d 506, 509 (4th Cir. 2003)). "However, if the defendant satisfies all three requirements, the illegal reentry charge must be dismissed as a matter of law." *Id.*

## II.   Exhaustion of Administrative Remedies and Opportunity for Judicial Review

Although Sorto-Gomez acknowledges that he did not appeal the 2012 Removal Order to the Board of Immigration Appeals ("BIA") and therefore did not pursue all available administrative remedies or judicial review, he argues that the first two requirements of 8 U.S.C. § 1326(d) are nevertheless satisfied because "fundamental defects in [his] immigration proceedings precluded him from exhausting any potential administrative remedies and deprived him of the opportunity to seek judicial review." Mot. Dismiss at 15. The United States Court of Appeals for the Fourth Circuit has recognized that "a failure to exhaust administrative remedies or seek judicial review as required by § 1326(d) will be excused, and a collateral attack permitted, where that failure is itself the product of a procedural flaw in the immigration proceeding." *Moreno-Tapia*, 848 F.3d at 169.

In particular, Sorto-Gomez references as a procedural flaw the fact that Sorto-Gomez's "right to appeal the IJ's removal order was not discussed by the IJ at any point during the removal

hearing." Mot. Dismiss at 15–16. In *El Shami*, where the Government failed to provide the noncitizen with written notice of his final deportation hearing such that he did not appear for the hearing at which he was ordered deported, the Fourth Circuit held that his failure to exhaust administrative remedies did not preclude a collateral challenge under § 1326(d) because he necessarily was never informed at the hearing of "his right to appeal to seek administrative and judicial review." *El Shami*, 434 F.3d at 664. The court thus held that such a failure to apprise a noncitizen of the right to seek such administrative and judicial review "satisfies the first two requirements for a collateral attack under section 1326(d)." *Id.*; *see also United States v. Fernandez Sanchez*, 46 F.4th 211, 216, 218 (4th Cir. 2022) (noting that the Government conceded that a noncitizen had "satisfied the first two requirements" under § 1326(d) where he was not informed of his right to appeal at his removal hearing and where he could not understand the written notice of that right in his NTA because it was written only in English); *United States v. Vasquez Flores*, No. 19-4190, 2021 WL 3615366, at \*3 (4th Cir. Aug. 16, 2021) (noting that, where the IJ did not advise the defendant of his appellate rights at his removal hearing, even while stating in the resulting immigration order that the defendant had waived those rights, the Government agreed that the defendant had satisfied "the first two prongs of the three-part test under § 1326(d)"); *United States v. Gonzalez-Villalobos*, 724 F.3d 1125, 1130 (9th Cir. 2013) (stating that "§ 1326(d)(1) and (d)(2) are satisfied when the IJ failed to inform the alien that he had a right to appeal his deportation order to the BIA").

The Government does not contest this principle. Rather, the Government argues that, as a factual matter, the IJ properly apprised Sorto-Gomez of his opportunities for administrative and judicial review. Under the INA, upon ordering an alien to be removed, the IJ "shall inform the alien of the right to appeal that decision." 8 U.S.C. § 1229a(c)(5); *see also* 8 C.F.R. § 1240.10(a)(3)

(2024) (requiring the IJ to "[a]scertain that the respondent has received a copy of appeal rights"). Upon review of the record, however, the Court finds insufficient evidence that the IJ actually apprised Sorto-Gomez of his right to appeal the Removal Order to the BIA. There can be no dispute that although the IJ referenced several important procedural rights at the outset of the Removal Hearing, the IJ provided no such notice of appeal at any point during the Removal Hearing.

The Government instead argues that the requirement of notice of appeal rights was satisfied by the IJ's statements at the conclusion of the separate Bond Hearing that occurred on the same day. Specifically, the IJ told Sorto-Gomez:

THE COURT: I am going to have to deny the request for a bond. Again I conclude that I don't have jurisdiction and that you are subject to mandatory detention.

You do have a right to appeal this decision. If you want to appeal my decision today, you would have to file an appeal with the Board of Immigration Appeals within 30 days. Would you like to file an appeal or would you like to waive your right to appeal?

MR. SORTO-GOMEZ: I would like to waive it. I would like to know if you could give me voluntary departure.

THE COURT: Okay. Then let me – the bond proceeding is closed.

Bond Hrg. Tr. at 7.

Whether viewed in isolation or in context, this exchange is not fairly construed as notifying Sorto-Gomez of his right to appeal the Removal Order. Although the Bond Hearing occurred on the same day as the Removal Hearing and may have occurred immediately following it, the IJ treated them as separate proceedings and formally and separately introduced the Bond Hearing as "bond proceedings." *Id.* at 3. The IJ's statement at the end of the Bond Hearing that Sorto-Gomez had "a right to appeal this decision" plainly referred to the bond decision, which was referenced immediately before the IJ provided this notice of appeal. Significantly, the IJ's written orders

14

reflect that this notice of appeal and Sorto-Gomez's oral waiver related only to the bond decision. In the Bond Order, the IJ marked the category of "appeal" as "waived." Bond Order at 1. By contrast, in the written Removal Order, the IJ marked the line for "appeal" as "reserved," with any appeal due by December 7, 2012, or 30 days after the issuance of the Removal Order. Removal Order at 1. If the notice of appeal provided at the Bond Hearing applied to the Removal Order as well, the Removal Order would have reflected that any appeal of the removal was also waived.

Although the reference to "appeal" in the Removal Order, *id.*, may suggest that there was some discussion with Sorto-Gomez of the right to appeal the Removal Order, perhaps in a follow-up removal hearing after the Bond Hearing, the Government has been unable to locate and produce a recording or transcript of such a proceedings. Notably, the Government has not even been able to identify any record, such as a log entry, that establishes that any such follow-up proceeding was conducted. Consequently, the Court finds that, based on the record presented, the evidence does not demonstrate that the IJ notified Sorto-Gomez of his right to appeal the Removal Order. Sorto-Gomez has therefore satisfied the first two prongs of 8 U.S.C. § 1326(d). *See El Shami*, 434 F.3d at 664; *United States v. Fernandez Sanchez*, No. 18-CR-00022, 2019 WL 7041513, at *4 (W.D. Va. Dec. 20, 2019) ("[T]he Court finds that there is no evidence that Fernandez Sanchez was even *told* of his right to appeal the IJ's decision, let alone evidence that he waived such a right. Accordingly, the Court concludes that the first two elements of § 1326—exhaustion of administrative remedies and opportunity for judicial review—have been satisfied." (internal citation omitted)), *aff'd* 46 F.4th 211 (4th Cir. 2022).

### III. Fundamental Unfairness

As for the third requirement for a collateral attack on a removal order, that the "entry of the order was fundamentally unfair," 8 U.S.C. § 1326(d)(3), Sorto-Gomez argues that the Removal

Hearing was fundamentally unfair because (1) Sorto-Gomez was not informed that he could seek certain forms of discretionary relief from deportation, including adjustment of status under NACARA and cancellation of removal under 8 U.S.C. § 1229b; (2) the IJ committed legal error by classifying Sorto-Gomez's prior convictions as for crimes involving moral turpitude, which informed her conclusion that certain forms of discretionary relief were unavailable; (3) the IJ failed to develop the record adequately during the Removal Hearing; and (4) Sorto-Gomez was not informed of his right to appeal the Removal Order.

To establish fundamental unfairness under § 1326(d)(3), a defendant must show that (1) "due process rights were violated by defects in [the] underlying deportation proceeding"; and (2) the defendant "suffered prejudice as a result of the defects." *El Shami*, 434 F.3d at 664. The Court will consider each prong in turn.

**A.     Due Process Violation**

"It is well established that the Fifth Amendment entitles aliens to due process of law in deportation proceedings." *Reno v. Flores*, 507 U.S. 292, 306 (1993). For purposes of a removal hearing, due process requires that a noncitizen be given (1) "notice of the charges"; (2) "a hearing before an executive or administrative tribunal"; and (3) "a fair opportunity to be heard." *El Shami*, 434 F.3d at 665 (quoting *United States v. Torres*, 383 F.3d 92, 104 (3rd Cir. 2004)).

**1.     Failure to Advise of Eligibility for Discretionary Relief**

First, Sorto-Gomez argues that the Removal Hearing did not comport with due process because the IJ failed to advise him of potential forms of discretionary relief, specifically relief under NACARA, cancellation of removal, and voluntary departure. At the hearing, the IJ, in fact, informed Sorto-Gomez that he could seek voluntary departure but did not inform him of the other two potential forms of discretionary relief. Regardless, this argument is squarely foreclosed by

16

the Fourth Circuit's decision in *United States v. Herrera-Pagoada*, 14 F.4th 311 (4th Cir. 2021), in which the court rejected the defendant's claim that his removal hearing violated due process and was fundamentally unfair for purposes of § 1326(d)(3) because he was not informed that he could seek voluntary departure. *Id.* at 320. The court held that the failure to notify the defendant of the potential availability of such relief did not violate his due process rights because "an alien has no constitutional right to be advised of his eligibility for discretionary relief." *Id.* at 321–22. Indeed, at the hearing on the Motion, Sorto-Gomez's counsel acknowledged that *Herrera-Pagoada* precludes this argument. Accordingly, the Court concludes that the IJ's alleged failure to advise Sorto-Gomez of potential forms of discretionary relief did not constitute a due process violation for the purpose of demonstrating fundamental unfairness under 8 U.S.C. § 1326(d)(3). *See Herrera-Pagoada*, 14 F.4th at 321–22.

### 2.   Substantive Legal Error

Next, Sorto-Gomez argues that his due process rights were violated by the IJ's alleged legal error that apparently led her to foreclose certain forms of discretionary relief. In particular, Sorto-Gomez claims that the IJ erroneously concluded that his convictions for malicious destruction of property were for crimes involving moral turpitude, thereby rendering him ineligible for cancellation of removal.

Even assuming, for purposes of this argument, that Sorto-Gomez is correct that the IJ's classification of the crimes of conviction as crimes involving moral turpitude was erroneous, any such substantive legal error did not violate Sorto-Gomez's due process rights. As the Fourth Circuit has recognized, "an error of law, without more, 'will ordinarily not rise to the level of a due process violation.'" *United States v. Lopez-Collazo*, 824 F.3d 453, 467 (4th Cir. 2016) (quoting *Torres*, 383 F.3d at 104). Although "there might be circumstances under which some

courts would conclude that a misapplication of the law as it existed at the time—not as understood in light of subsequent judicial decisions—led to a due process violation," the Court concludes that Sorto-Gomez's argument does not identify such circumstances. *Id.* At most, Sorto-Gomez argues that the IJ's error of law resulted in a failure to advise him of forms of discretionary relief for which he may have been eligible. Yet, as discussed above, within the Fourth Circuit there is no due process right to be advised of potential forms of discretionary relief. *See Herrera-Pagoada*, 14 F.4th at 322. Thus, Sorto-Gomez has merely identified a possible "error of law, without more." *Lopez-Collazo*, 824 F.3d at 467. Under these circumstances, the proper course of action would have been to seek administrative or judicial review of the IJ's conclusion relating to the status of the convictions. *Cf. United States v. Palomar-Santiago*, 141 S. Ct. 1615, 1621 (2021) ("Administrative review of removal orders exists precisely so noncitizens can challenge the substance of immigration judges' decisions."); *United States v. Charleswell*, 173 F.3d 425, at *3 n.* (4th Cir. Feb. 8, 1999) (unpublished) ("In this case, however, no such fundamental procedural error exists: instead, the immigration judge simply made a substantive error of law—albeit an egregious one—of precisely the sort that could have been corrected on appeal."). Any error in concluding that Sorto-Gomez's crimes of conviction were crimes involving moral turpitude therefore does not establish a due process violation.

### 3.      Failure to Develop the Record

Sorto-Gomez makes the additional argument that his due process rights were violated by the IJ's failure to develop the record, including by asking sufficient questions to elicit facts needed to ascertain whether Sorto-Gomez was eligible for one or more forms of discretionary relief, such that the hearing was fundamentally unfair. For this argument, Sorto-Gomez relies on *Quintero v. Garland*, 998 F.3d 612 (4th Cir. 2021), in which the court held that under the INA, specifically, 8

18

U.S.C. § 1229a(b)(1), "immigration judges have a legal duty to fully develop the record, which becomes particularly important in *pro se* cases," and that such development "is essential for ensuring fundamental fairness and reasoned decisionmaking in removal proceedings." *Quintero*, 998 F.3d at 626, 647. *Quintero*, however, specifically held that this legal duty is rooted in the INA and expressly declined to find, as some other circuits have held, that such a duty also arises under the Due Process Clause. *Id.* at 623–24, 626 & n.13. Notably, in *Herrera-Pagoada*, decided four months after *Quintero*, the Fourth Circuit reiterated that "*Quintero* didn't decide whether the IJ's error" in failing to fully develop the record "was in fact a due process violation" and instead "only repeated the uncontroversial proposition that the denial of statutory or regulatory protections violates constitutional rights if it '[d]eprives a noncitizen of a full and fair hearing consistent with due process.'" *Herrera-Pagoada*, 14 F.4th at 321 (quoting *Quintero*, 998 F.3d at 624 n.11). Thus, to conclude that the failure to fully develop the record violates due process requires an extension of *Quintero* beyond what the Fourth Circuit has already decided.

The Court declines to do so for two reasons. First, where the Fourth Circuit has twice refrained from finding that the duty to fully develop the record is a matter of due process, this Court is reluctant to do so. Second, such an extension would appear to be inconsistent with the tenor of *Herrera-Pagoada*, in which the court rejected the argument that pursuant to the duty found in *Quintero*, an IJ's "failure to inform" the defendant "of available discretionary relief," in that case voluntary departure, "is a due process violation." *Id.* Where the purpose of fully developing the record would presumably be to uncover possible grounds for discretionary relief and to provide a factual basis to support applications for such relief, it is difficult to reconcile the Fourth Circuit rule that due process does not require an IJ to advise an alien of the availability of discretionary relief, even relief that would likely be granted, with the claim that due process nevertheless requires

an IJ to engage in such factual development. Indeed, where the Fourth Circuit has consistently identified the rights to receive notice of the charges, a hearing before a tribunal, and a "fair opportunity to be heard" to be the core elements of due process in relation to a removal proceeding, its reasoning in *Herrera-Pagoada* that the failure to inform an noncitizen of the availability of discretionary relief does not violate due process because it "didn't compromise any of these rights" applies equally to the claim that the failure to fully develop the record at a removal hearing violates due process. *Cf. United States v. Avila-Flores*, No. 19-4769, 2022 WL 17831443, at \*1 (4th Cir. Dec. 21, 2022) (unpublished) (rejecting the defendant's argument that his underlying removal proceedings were fundamentally unfair where the defendant argued in part that "the IJ improperly or inadequately advised him regarding the relief of voluntary departure" and that "the IJ failed to properly maintain the record" because he did not have a "due process right to be advised of discretionary relief" and had failed to show that he did not receive notice of the charges, a hearing, and "a fair opportunity to be heard" (quoting *Herrera-Pagoada*, 14 F.4th at 320–21)). The Court therefore declines to find that Sorto-Gomez has established a due process violation based on the failure to fully develop the record.

### 4.    Notice of Appeal

Finally, Sorto-Gomez argues that the IJ's failure to give him notice of his right to appeal an adverse removal decision violated his due process rights. As discussed above, based on the available record, the Court finds that the evidence does not demonstrate that the IJ informed Sorto-Gomez of his right to appeal the Removal Order. *See supra* part II.

At the hearing on the Motion, the Government acknowledged that an IJ's failure to inform a noncitizen of the right to appeal an adverse removal decision would violate that individual's due process rights. Even absent this agreement, however, the Court finds that such a failure constitutes

a due process violation for purposes of 8 U.S.C. § 1326(d)(3). Although the Fourth Circuit has not squarely decided this issue, in *United States v. Fernandez Sanchez*, 46 F.4th 211 (4th Cir. 2022), it assumed that an IJ's failure to inform the defendant of his right to appeal a removal order constituted a due process violation because the Government had waived any argument on that question, then found that this failure resulted in actual prejudice such that the removal hearing was fundamentally unfair and dismissal of the illegal reentry charge was warranted. *Id.* at 215–16, 219, 226. In so ruling, the court "recognized the 'due process implications' of a noncitizen's 'waiver of his appellate rights' in a similar setting." *Id.* at 219 n.7 (quoting *Narine v. Holder*, 559 F.3d 246, 240–50 (4th Cir. 2009)).

Notably, several United States Courts of Appeals have specifically recognized that an IJ's failure to advise a noncitizen of the right to appeal an adverse removal decision violates due process for purposes of § 1326(d)(3). For example, in *United States v. Ubaldo-Figueroa*, 364 F.3d 1042 (9th Cir. 2004), the court affirmed the district court's finding that the defendant's "underlying deportation hearing deprived him of due process because the IJ did not inform him that he had the right to appeal his removal order." *Id.* at 1048 ("It is 'mandatory' under the Due Process Clause that an IJ inform an alien of his or her ability to appeal a removal order during a removal proceeding" (quoting *United States v. Arce-Hernandez*, 163 F.3d 559, 563 (9th Cir. 1998))). Other circuits have directly or indirectly reached the same conclusion. *See United States v. Fares*, 978 F.2d 52, 57 (2d Cir. 1992) (permitting a collateral attack on a deportation order "on the ground that [the defendant] was not properly advised of his right to appeal" but requiring a showing that "he was prejudiced by that defect"); *United States v. Escobar-Garcia*, 893 F.2d 124, 126 (6th Cir. 1990) (stating that "advising [the defendant] of his right to appeal the deportation order satisfied *Mendoza-Lopez* and provided him with due process of notice of his appellate rights"); *cf. United*

21

*States v. Santos-Vanegas*, 878 F.2d 247, 248–51 (8th Cir. 1989) (stating that although the IJ informed the defendant of his right to appeal a deportation order to the BIA, the deportation order could not be used in a § 1326 prosecution because "he was never apprised" by the IJ during the hearings or otherwise, "of his right to appeal the administrative decision in federal court"). Significantly, in reaching this conclusion, many of these cases rely on *Mendoza-Lopez*, in which the Supreme Court, at the Government's invitation, accepted "the legal conclusions of the court below that the deportation hearing violated due process" where the IJ failed "to explain adequately [the defendants'] right to suspension of deportation or their right to appeal." *Mendoza-Lopez*, 481 U.S. at 839–40.

In light of the general consensus among the United States Courts of Appeals that a failure to provide notice of the right to appeal violates due process for purposes of § 1326(d), and where that conclusion is traceable in part to *Mendoza-Lopez*, which established the right to collateral review of a deportation order to be used in a § 1326 prosecution, the Court finds that the failure to notify a noncitizen of the right to appeal a removal order establishes a due process violation as required for a collateral attack by § 1326(d)(3). Where, as discussed above, the Court has found that the record does not support a finding that Sorto-Gomez was provided with notice of his right to appeal the Removal Order, the Court finds that the necessary due process violation has been established.

### B.     Prejudice

The remaining question is whether Sorto-Gomez "has shown that the immigration judge's denial of his appellate rights prejudiced him." *Fernandez Sanchez*, 46 F.4th at 220. "To satisfy the second step of the fundamental-unfairness inquiry, 'a defendant must show that he suffered actual prejudice as a result of the due process violations in the removal proceedings.'" *Id.* (quoting

22

*Lopez-Collazo*, 824 F.3d at 462). "This is not a generalized showing of prejudice; rather, the defendant must link the actual prejudice he claims to have suffered to the specific due process violation at issue." *Id.* (quoting *Lopez-Collazo*, 824 F.3d at 462). Thus, to establish prejudice, Sorto-Gomez must establish that in the absence of the due process violation, (1) "he would have successfully appealed if given the opportunity"; and (2) "he would have sought and been granted [relief from deportation] on remand." *Id.* at 221.

"However, that link need not be ironclad—a defendant need not show with certainty that the violation altered the outcome." *Id.* at 220. "So long as the defendant shows that 'but for the [due-process] errors complained of, there was a reasonable probability that he would not have been deported,' the prejudice prong is satisfied." *Id.* (quoting *El Shami*, 434 F.3d at 665). "A 'reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Id.* (quoting *United States v. Terrazas-Silas*, 811 F. App'x 845, 847 (4th Cir. 2020) (per curiam)). Under this standard, it is not necessary for the defendant to demonstrate a "particular probability" for "each step in this chain of causation." *Id.* at 221 n.10.

### 1.   Successful Appeal

The first step in this inquiry is to determine whether Sorto-Gomez would have successfully appealed the Removal Order if he had been given notice of his right to appeal. In *Fernandez Sanchez*, in which the defendant was likewise not notified of his right to appeal his removal order, the Fourth Circuit concluded that the defendant had sufficiently established that he would have successfully appealed the removal order against him where the IJ had entered the order without considering whether the defendant should receive pre-conclusion voluntary departure. *Id.* at 221–22. The court found that it was "highly probable" that the defendant would have filed an appeal if given the opportunity because he had shown a willingness to use the legal process available to

him, he had "stated that he did not want to be deported and explained that he wished to remain in the United States with his minor children and their mother," and an appeal "offered the only realistic avenue of accomplishing both things." *Id.* at 221. The court then found that an appeal would have likely been successful because the IJ's failure "to consider a potentially eligible noncitizen for pre-conclusion voluntary departure is reversible error." *Id.*

Here, the Court finds that, for similar reasons, Sorto-Gomez has sufficiently established that there was a reasonable probability he would have successfully appealed the Removal Order if given the opportunity, specifically on the issue of the denial of pre-conclusion voluntary departure. First, the Court finds a reasonable probability that Sorto-Gomez would have pursued an appeal on this issue if notified of the right do so. As in *Fernandez Sanchez*, Sorto-Gomez clearly expressed his desire to remain in the United States with his mother, his girlfriend, and his two minor children, all of whom either had legal status or were United States citizens. For example, at the Bond Hearing, Sorto-Gomez stated that he needed to assist his mother with work so as to help pay rent, as "she is about to lose her house," that he needed to assist his girlfriend as she pursued her college degree, and that she needed him to "be there for the children." Bond Hrg. Tr. at 5–6. Although Sorto-Gomez declined to pursue certain steps available to him, such as consulting with an attorney and appealing the denial of bond, he notably made a specific request at the end of Bond Hearing that the IJ consider him for voluntary departure. That request demonstrated a "willingness to utilize the legal process made available to him," at least as to that issue. *Fernandez Sanchez*, 46 F.4th at 221.

Second, there is a reasonable probability that the appeal would have been successful on the issue of voluntary departure. "To qualify for pre-conclusion voluntary departure, a noncitizen must (1) make a request for such voluntary departure 'prior to or at the master calendar hearing at

24

which the case is initially calendared for a merits hearing'; (2) make 'no additional requests for relief'; (3) concede removability; (4) waive appeal of 'all issues'; and (5) not have been convicted of an aggravated felony." *Id.* at 222 (quoting 8 C.F.R. § 1240.26(b)(1)(i)). "If a noncitizen satisfies all five regulatory factors, they must also show that they merit a favorable exercise of discretion." *Id.* Where Sorto-Gomez made a request for voluntary departure on the record, none of his prior convictions constitute an aggravated felony under the INA, and the record of the Removal Hearing demonstrates that the three remaining factors are satisfied, the Government does not dispute that Sorto-Gomez was eligible for pre-conclusion voluntary departure, subject to a determination of whether he merited a favorable exercise of discretion. The IJ, however, apparently denied voluntary departure summarily, without argument or analysis. Although the Removal Order reflects, through a checked box, that the IJ denied Sorto-Gomez's request for pre-conclusion voluntary departure in an "oral decision," Removal Order at 1, the transcripts of the Removal Hearing and the Bond Hearing reveal that no such decision was issued during those proceedings, and there is no evidence of any other proceeding at which such a decision could have been rendered. Indeed, at the hearing on the Motion, the Court asked the Government directly (1) whether the Government was asserting that a voluntary departure hearing had occurred but that the audio recording was not available; (2) whether the Government was aware of any record or form demonstrating that a voluntary departure hearing had taken place; and (3) whether there was any other argument the Government would make to infer that some other proceeding occurred beyond the Removal Hearing and the Bond Hearing. The Government responded in the negative to each question.

In the absence of any evidence that Sorto-Gomez was permitted to make an argument for voluntary departure, or that the IJ considered or weighed any of the factors relevant to a voluntary

departure determination, particularly on the question of whether there should be a favorable

exercise of discretion, the Court concludes that there is a reasonable probability the BIA would

have, at minimum, vacated and remanded the IJ's denial of Sorto-Gomez's request for pre-

conclusion voluntary departure. The BIA has long recognized that, when determining whether an

otherwise statutorily eligible noncitizen is entitled to a favorable exercise of discretion and thereby

merits an award of discretionary relief, an IJ must weigh all factors relevant to that determination.

*See Matter of Edwards*, 20 I. & N. Dec. 191, 195 (BIA 1990) ("The exercise of discretion in a

particular case necessarily requires consideration of all the facts and circumstances involved.").

To that end, the BIA has identified factors to be weighed when determining whether a noncitizen

is entitled to a favorable exercise of discretion on a request for pre-conclusion voluntary departure.

*See In re Arguelles-Campos*, 22 I. & N. Dec. 811, 817 (BIA 1999) (en banc). Specifically:

> [M]any factors may be weighed in exercising discretion with voluntary departure
> applications, including the nature and underlying circumstances of the deportation
> ground at issue; additional violations of the immigration laws; the existence,
> seriousness, and recency of any criminal record; and other evidence of bad
> character or the undesirability of the applicant as a permanent resident. We further
> stated that discretion may be favorably exercised in the face of adverse factors
> where there are compensating elements such as long residence here, close family
> ties in the United States, or humanitarian needs.

*Id.* Federal courts have specifically adopted and applied these factors. *See, e.g.*, *United States v.*

*Valdez-Novoa*, 780 F.3d 906, 917 (9th Cir. 2015) (citing *In re Arguelles-Campos*); *United States*

*v. Ramirez*, 962 F.3d 1056, 1060 (8th Cir. 2020) (same); *United States v. Ordoñez*, 328 F. Supp.

3d 479, 496 (D. Md. 2018) (same). When IJs have failed to weigh both an applicant's positive

and negative equities, the case should be remanded for further proceedings. *See Campos-Granillo*

*v. INS*, 12 F.3d 849, 853 (9th Cir. 1993) ("In the absence of a clear demonstration that the IJ

considered both the positive and negative factors when making her discretionary decision not to

grant voluntary departure, we are required to vacate and remand."); *Matter of Aguilar-Mendez*, 28

26

I. & N. Dec. 262, 266 (BIA 2021) (reversing and remanding where the IJ "did not make findings of fact regarding the relevant favorable and unfavorable factors in making this discretionary determination"); *see also In re Alejandro Medrano Nava*, No. AXXX XX7 594, 2010 WL 3355048, at \*2 (BIA July 16, 2010) (unpublished) (reversing and remanding where the IJ "failed to balance any positive factors that the respondent may possess against any negative factors presented, such as the respondent's recent criminal conviction"). Here, where there is no record demonstrating that Sorto-Gomez had an opportunity to argue for voluntary departure, or that the IJ engaged in a proper weighing of Sorto-Gomez's positive and negative equities, the Court concludes that it is reasonably probable that, had Sorto-Gomez appealed, the BIA would have vacated and remanded the case to the IJ for further proceedings. *See Campos-Granillo*, 12 F.3d at 853; *see also Fernandez Sanchez*, 46 F.4th at 224 (finding that the BIA would have remanded the case where the IJ did not properly consider the defendant's request for voluntary departure).

### 2. Successful Grant of Relief

Next, the Court must determine whether, upon remand from the BIA, there is a reasonable probability that Sorto-Gomez would have been granted relief from deportation. As discussed above, there is no dispute that Sorto-Gomez was eligible for pre-conclusion voluntary departure in that he satisfied the five enumerated factors. Indeed, at the Removal Hearing, the Government acknowledged that he was eligible for pre-hearing voluntary departure even while stating that it would oppose such a request. Thus, this Court must focus on the factors, described above, relevant to the determination of whether discretion should be favorably exercised to grant pre-conclusion voluntary departure. *See Arguelles-Campos*, 22 I. & N. Dec. at 817. Several of these considerations pointed strongly to a favorable exercise of discretion. Sorto-Gomez came to the United States as a child when he was approximately 11 years old, had lived in the United States

27

for 14 years, and had strong family ties in that his mother had legal status, his girlfriend who he intended to marry and their two minor children were United States citizens, and all of these family members depended on him financially and otherwise. *See id.* (identifying long residence and close family ties in the United States as relevant considerations). He had no prior history of deportation or removal or of multiple unlawful entries into the United States. *See id.* (identifying whether there were "additional violations of the immigration laws" as a factor). Thus, the basis for denying a favorable exercise of discretion rests entirely on Sorto-Gomez's criminal record at the time, which provided one of the grounds for removal and which included three convictions for malicious destruction of property and multiple other arrests and charges that did not result in convictions. *See id.* (considering the "nature and underlying circumstances of the deportation ground at issue" and "the existence, seriousness, and recency of any criminal record"). The Court may not consider Sorto-Gomez's troubling criminal history and immigration history post-dating the Removal Hearing because such conduct could have had no impact on whether Sorto-Gomez would have successfully obtained relief from removal on appeal. *See United States v. Scott*, 394 F.3d 111, 118 (2d Cir. 2005).

In assessing the impact of Sorto-Gomez's criminal record, the Court first considers how much weight, if any, to give to the prior arrests or charges that did not result in convictions, which include very serious charges such as attempted murder, assault, burglary, drug distribution, and illegal possession of a handgun. The Fourth Circuit has recognized that it is not *per se* improper for the BIA to consider arrest reports in conducting their discretionary analyses. *See Sorcia v. Holder*, 643 F.3d 117, 126 (4th Cir. 2011). Nevertheless, the Fourth Circuit has also recognized that, under BIA precedent, the agency is "hesitant to give substantial weight to an arrest report, absent a conviction or corroborating evidence of the allegations contained therein." *Id.* (quoting

28

*Matter of Arreguin*, 21 I. & N. Dec. 38, 42 (BIA 1995)). In *Matter of Arreguin*, 21 I. & N. Dec. 38 (BIA 1995), in which the BIA granted a waiver of inadmissibility under section 212(c) of the INA to a noncitizen who had a prior conviction for drug importation, the BIA gave "little weight" in its discretionary analysis to an arrest report alleging that she had engaged in alien smuggling. *Id.* at 39, 42. Citing *Arreguin*, the Fourth Circuit has concluded that an IJ, in finding that an applicant lacked good moral character and was therefore ineligible for cancellation of removal under 8 U.S.C. 1229b, erred in giving substantial and dispositive weight to a police report that resulted in charges of aggravated sexual battery and a sex crime involving a child where the charges were later dismissed. *See Garcia Rogel v. Garland*, No. 21-1163, 2022 WL 4244508, at *4 (4th Cir. Sept. 15, 2022) (unpublished).

Other courts have applied *Arreguin* in finding that arrest reports or criminal charges that did not result in a conviction should not be given substantial weight in determinations of whether to exercise discretion in relation to requests for immigration relief. *See Rosa v. Garland*, 114 F.4th 1, 18, 21–22 (1st Cir. 2024) (stating that "*Arreguin*'s holding . . . is germane to the [BIA's] consideration of positive and negative factors in any discretionary decision-making process," collecting cases from other circuits supporting that conclusion, and finding that in the absence of corroborating evidence, the BIA would be deemed to have improperly given substantial weight to a police report and a pending indictment of the applicant for rape of a minor in denying adjustment of status under 8 U.S.C. § 1255 as a matter of discretion); *Billeke-Tolosa v. Ashcroft*, 385 F.3d 708, 712–13 (6th Cir. 2004) (vacating a denial of a discretionary adjustment of status in which the IJ relied on the fact that the applicant had been charged with sex crimes on two occasions, where he was convicted only of the lesser offenses of simple assault and disorderly conduct); *Avila-Ramirez v. Holder*, 764 F.3d 717, 722–23, 725 (7th Cir. 2014) (remanding because the BIA erred

when, in denying discretionary relief from removal, it gave "significant weight to uncorroborated arrest reports" relating to incidents involving alleged stalking, credit card theft, inappropriate contact with a minor, and unlawful possession of a firearm for which charges were either never instituted or later dropped).

Consistent with such precedent, the Court will not give substantial weight to the multiple uncorroborated criminal charges on Sorto-Gomez's record which did not result in convictions. Notably, the evidence in the record relating to these charges is limited to entries in Sorto-Gomez's I-213 Form, "Record of Deportable/Inadmissible Alien," relating to a removal that occurred a year after the removal at issue in this case, that provided no information other than the specific crimes charged and entries establishing that the charges were disposed of by dismissal or *nolle prosequi* or otherwise did not result in a conviction. There is no information in the record corroborating these charges; rather, the only additional information about them consists of Sorto-Gomez's statements during the Bond Hearing in which he did not acknowledge guilt but rather explained that in one instance, he was not present when the crime occurred. Under these circumstances, the Court may give only limited weight to the criminal charges against Sorto-Gomez other than those that resulted in convictions. *See Sorcia*, 643 F.3d at 126; *Rosa*, 114 F.4th at 21–22; *Matter of Arreguin*, 21 I. & N. Dec. at 42.

Upon consideration of Sorto-Gomez's three convictions for malicious destruction of property, along with the limited weight given to the charges that did not result in convictions, the Court finds that they do not establish that an IJ necessarily would deny a favorable exercise of discretion as required for a grant of voluntary departure, particularly in light of Sorto-Gomez's lengthy history in, and strong family ties to, the United States. Although the Fourth Circuit did not have occasion in *Fernandez Sanchez* to evaluate whether the defendant would receive a

30

favorable exercise of discretion in relation to voluntary departure, *see* 46 F.4th at 222, it has had occasion to consider whether a criminal record would preclude a favorable exercise of discretion in relation to other forms of immigration relief. In *El Shami*, for example, the Fourth Circuit vacated an illegal reentry conviction because it found that the defendant had not received proper notice of his removal hearing, and that there was a reasonable probability that the defendant would have received a favorable exercise of discretion and thus been awarded a waiver of deportation under section 212(c) of the INA, even though the defendant had two "serious felony convictions" qualifying as crimes involving moral turpitude, specifically, criminal sexual contact and aggravated arson. *El Shami*, 434 F.3d at 661–62, 665–66. The court found that, while the defendant's convictions constituted adverse factors weighing against a favorable exercise of discretion, there was substantial mitigating evidence in the record, including that the defendant had lived in the United States for 13 years, he had a wife and son who were United States citizens and depended on him for support, and he owned a small business for which he paid income taxes. *Id.* at 665–66.

By contrast, in *United States v. Villarreal Silva*, 931 F.3d 330 (4th Cir. 2019), the Fourth Circuit concluded that the defendant had not shown that his removal hearing was fundamentally unfair under 8 U.S.C. § 1326(d)(3) in part because he failed to show a reasonable probability that he would have received relief as a matter of discretion in the form of withdrawal of an admission application under 8 U.S.C. § 1225(a)(4). *Id.* at 338. In particular, the court relied on the facts that, at the time of his removal, the defendant "had seven criminal convictions — six misdemeanors and one felony," including convictions for a firearms offense, identity theft, resisting arrest, and driving while intoxicated, had on five occasions been allowed to return to Mexico voluntarily after entering illegally but then returned to the United States, and had recently engaged in fraud during

his latest attempt to reenter, including by using someone else's passport card, misidentifying himself, and falsely representing that he was a U.S. citizen. *Id.* at 333, 338. Under these circumstances, the court concluded that the defendant was unable to demonstrate a reasonable probability of receiving relief from deportation as a matter of discretion. *Id.* at 339.

Here, Sorto-Gomez's circumstances align more closely with the facts of *El Shami* than *Villareal Silva*. Just as the defendant in *El Shami* had a long history in and strong family ties to the United States, Sorto-Gomez had come to the United States as a child and resided here for 14 years prior to his removal proceedings, his mother had legal status in the United States, his girlfriend whom he intended to marry and their two minor children were United States citizens, and all of these family members depended upon Sorto-Gomez for financial or other support. Although Sorto-Gomez did not own a business, he had received schooling in the United States and had employment. Where the *El Shami* defendant's two prior convictions for crimes involving moral turpitude consisting of criminal sexual contact and aggravated arson did not prevent a favorable exercise of discretion, Sorto-Gomez's criminal record did not necessarily require a denial of voluntary departure as a matter of discretion. Even assuming, without deciding, that Sorto-Gomez's three convictions for malicious destruction of property qualified as crimes involving moral turpitude, these property crimes were less serious than the crimes involving moral turpitude at issue in *El Shami*, which were more likely to result in violence or injury to another person. Further, Sorto-Gomez's convictions appear to have arisen out of a single course of conduct, while those in *El Shami* arose out of separate courses of conduct. *Cf. Valdez-Novoa*, 780 F.3d at 919 (concluding that convictions were less impactful for the purpose of determining whether a noncitizen was entitled to a favorable exercise of discretion where they "arose from a single incident rather than a pattern of ongoing and increasingly serious misconduct and they did

32

not involve violence toward others"). By contrast, the defendant in *Villareal Silva* lacked the lengthy history in and family ties to the United States that Sorto-Gomez had, he had more criminal convictions than Sorto-Gomez, including convictions for a firearms offense and for identity theft, and he, but not Sorto-Gomez, had a history of repeated illegal reentries into the United States and of engaging in fraud relating to the immigration process. *See Villareal Silva*, 931 F.3d at 338. The Court thus finds that, consistent with *El Shami*, Sorto-Gomez's criminal record did not necessarily preclude a favorable exercise of discretion.

This conclusion is bolstered by decisions of other courts addressing whether a defendant in an illegal reentry case can establish prejudice for purposes of the third prong of § 1326(d) based on the argument that he could have received a favorable exercise of discretion so as to receive discretionary relief from deportation. In *United States v. Cerna*, 603 F.3d 32 (2d Cir. 2010), for example, the United States Court of Appeals for the Second Circuit reversed a district court's conclusion that the defendant would not have received a favorable exercise of discretion with respect to his request for a waiver of deportation under § 212(c) of the INA, even though the defendant had two convictions for selling controlled substances and a conviction for attempted criminal possession of a weapon in the third degree. *Id.* at 41–42 (declining to agree that the defendant's "criminal record alone, as a matter of law, renders it improbable that he would have received § 212(c) relief"). Similarly, in *United States v. Calderon*, 391 F.3d 370 (2d Cir. 2004), the Second Circuit affirmed a district court's conclusion that the defendant sufficiently showed that he would have received a favorable exercise of discretion with respect to his request for a waiver of deportation, even though the defendant had convictions for possession with intent to distribute a controlled substance, criminal mischief, and assault by automobile. *Id.* at 372, 376; *see also United States v. Copeland*, 376 F.3d 61, 63, 74–75 (2d Cir. 2004) (reversing the district

33

court's conclusion that the defendant had not shown a reasonable probability that he would have received discretionary relief under section 212(c) of the INA in part because the district court failed to fully consider the defendant's family relationships and other favorable factors, even where the defendant had convictions for criminal possession of a weapon in the third degree, attempted criminal sale of a controlled substance in the third degree, and criminal possession of a weapon in the second degree and been charged with attempted murder, robbery, and assault after the defendant shot a man during an armed robbery).

In the specific context of whether an illegal reentry defendant could establish prejudice by showing a reasonable probability that he would not have been removed because he could have received voluntary departure, judges in this District have found that defendants with similar or more substantial criminal histories than Sorto-Gomez were able to make such a showing. *See, e.g.*, *United States v. Cruz-Candela*, 399 F. Supp. 3d 454, 465 (D. Md. 2019) (finding a reasonable probability that a favorable exercise of discretion would be granted to permit pre-conclusion voluntary departure, even where the defendant had convictions for assault and driving while intoxicated); *Ordoñez*, 328 F. Supp. 3d at 497 (finding a reasonable probability that a favorable exercise of discretion would be granted to permit pre-conclusion voluntary departure, even where the defendant had a conviction for aggravated assault and several juvenile arrests).

While applying a different standard for prejudice of whether the defendant had a plausible ground for relief, the United States Court of Appeals for the Ninth Circuit has on multiple occasions concluded that defendants with criminal histories similar to that of Sorto-Gomez nevertheless could have received favorable exercises of discretion on their requests for pre-conclusion voluntary departure. *See, e.g.*, *United States v. Ortega*, 751 F. App'x 985, 986–87 (9th Cir. 2018) (concluding that it was plausible that a defendant would have received a favorable

34

exercise of discretion even though he had numerous misdemeanor convictions, including for theft, property destruction, driving under the influence, fourth-degree assault, three violations of protective orders relating to his wife, and a felony conviction for bail jumping); *United States v. Alcazar-Bustos*, 382 F. App'x 568, 569 (9th Cir. 2010) (concluding that it was plausible that a defendant would have been received a favorable exercise of discretion where the defendant had "three juvenile adjudications" and "two convictions for firearm possession that resulted in prison terms"); *United States v. Vasallo-Martinez*, 360 F. App'x 731, 732–33 (9th Cir. 2009) (concluding that it was plausible that a defendant would have received a favorable exercise of discretion where the defendant had four driving under the influence convictions and three unrelated misdemeanors). In each of these cases, the Ninth Circuit determined that the defendant's negative equities were outweighed by his positive equities, many of which resemble Sorto-Gomez's own circumstances, such as having entered the United States as a child, having lived in the United States for a significant period of time, having an educational and work history in the United States, and having strong family ties in the United States, including children who were United States citizens. *See Ortega*, 751 F. App'x at 986–87; *Alcazar-Bustos*, 382 F. App'x at 570; *Vasallo-Martinez*, 360 F. App'x at 733.

Finally, the BIA, in cases relied upon in federal cases such as *Vasallo-Martinez* and *Cruz-Candela*, has on multiple occasions upheld grants of voluntary departure to applicants with criminal convictions similar to or more substantial than those of Sorto-Gomez. *See, e.g.*, *In re Gonzales-Figeroa*, No. A29013696, 2006 WL 729784, at *1–2 (BIA Feb. 10, 2006) (unpublished) (affirming a grant of voluntary departure to an applicant who had four convictions for assault, one conviction for resisting arrest, and numerous other arrests); *In re Pineda-Castellanos*, No. A77212443, 2005 WL 3833024, at *1–2 (BIA Nov. 16, 2005) (unpublished) (affirming a grant of

voluntary departure to an applicant who had six criminal convictions, including two for battery and convictions for illegal entry, threatening, and driving under the influence). Relatedly, in an unpublished BIA decision, cited by the Government, that involved an applicant with two convictions for malicious destruction of property under the same Maryland statute underlying Sorto-Gomez's convictions, the BIA concluded that the applicant was nevertheless entitled to a favorable exercise of discretion and thus merited cancellation of removal. *See In re: Bilal Shaikh*, AXX-XX6-350, 2006 WL 8201582, at *1, *2 (BIA Mar. 22, 2006) (unpublished). In fact, the BIA reached this conclusion even after determining that the malicious destruction of property crimes qualified as crimes involving moral turpitude, as it instead focused on the applicant's arrival in the United States as a child and his strong family ties to the United States, as well as the fact that his crimes "resulted in no harm to persons." *Id.* at *2.

As these cases illustrate, where Sorto-Gomez met the eligibility requirements for pre-conclusion voluntary departure, and he had significant positive equities in that he came to the United States as a child, had resided here for 14 years, and had strong family ties including children who are United States citizens, his criminal history consisting of three convictions for malicious destruction of property arising out of a single course of conduct and multiple additional charges that did not result in convictions did not preclude a favorable exercise discretion, the remaining requirement for pre-conclusion voluntary departure. The Court therefore finds that there was a reasonable probability that, on remand from an appeal, Sorto-Gomez would have received pre-conclusion voluntary departure and thus would not have been removed. In so ruling, the Court does not find that voluntary departure should have or necessarily would have been granted. It also does not find that Sorto-Gomez, particularly with his negative post-removal criminal record and immigration history, should not be deported anew following the proceedings in this case. Rather,

it finds only that the potential that voluntary departure would have been granted on remand is sufficient to "undermine confidence in the outcome" of the removal proceedings, specifically that Sorto-Gomez was removed from the United States, so as to establish that the failure to notify Sorto-Gomez of his right to appeal was prejudicial and rendered the Removal Hearing fundamentally unfair. *Fernandez Sanchez*, 46 F.4th at 220 (quoting *Terrazas-Silas*, 811 F. App'x at 847). The Court therefore need not and will not address whether on remand from an appeal, Sorto-Gomez could have or would have received any other form of discretionary relief.

Because Sorto-Gomez has established each of the required elements under 8 U.S.C. § 1326(d), the Court finds that the 2012 Removal Order may not be relied upon to establish the pending charge of Reentry of an Alien Removed After a Felony Conviction, 8 U.S.C. §§ 1326(a) and (b)(1). *See Moreno-Tapia*, 848 F.3d at 165. The Motion to Dismiss will therefore be granted.

## CONCLUSION

For the foregoing reasons, it is hereby ORDERED that Sorto-Gomez's Motion to Dismiss the Indictment, ECF No. 29, will be GRANTED. A separate Order shall issue.

Date: January 30, 2025

THEODORE D. CHUANG
United States District Judge